THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RICHARD O. WRIGHT, Defendant-Appellee.

Fifth District   No. 5—91—0517

Opinion filed February 1, 1993.

---

*Justice Harrison participated in oral argument. Justice Maag was later assigned to this case in substitution for Justice Harrison, and Justice Maag has read the briefs and listened to the audiotape of oral argument.

Thomas E. Price, State's Attorney, of Mt. Carmel (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Janet Gandy Fowler, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The People of the State of Illinois appeal from the July 13, 1991, order of the circuit court of Wabash County vacating the guilty verdicts rendered on May 17, 1991, following jury trial on counts II, III, V, VII, VIII, IX, X, XIII, XV, and XVII of a 17-count indictment, against defendant, Richard O. Wright. In so ruling, the

trial court found that the guilty verdicts on these 10 counts of the indictment were inconsistent with the not guilty verdicts rendered by the jury on the other seven counts with which defendant had been charged. The State brings its appeal pursuant to Supreme Court Rule 604(a) (134 Ill. 2d R. 604(a)), noting that the July 1, 1991, order was a dismissal of the 10 counts for a reason unrelated to factual guilt. The State argues in this appeal that the trial court erred in vacating the 10 guilty verdicts and finding them to be inconsistent with the not guilty verdicts on the other counts.

Defendant was indicted by the Wabash County grand jury on January 6, 1988, with 13 counts of theft by deception in excess of $300, two counts of filing a fraudulent State income tax return, and two counts of perjury with respect to the filing of those tax returns. Each of the theft counts alleged that defendant had knowingly obtained, by deception, control over property of Merrill H. Wright (hereinafter decedent), which property consisted of money in the form of certain enumerated checks of varying amount and date, drawn on the account of decedent at the Security Bank and Trust Company of Mt. Carmel, Illinois. The theft counts further alleged that the aggregate value of the enumerated checks totalled in excess of $300 and that defendant converted said money to his own use with the intent to deprive decedent permanently of the use of said property, in violation of section 16—1(b)(1) of the Criminal Code of 1961. Ill. Rev. Stat. 1987, ch. 38, par. 16—1(b)(1).

Counts XIV and XV of the indictment charged defendant with filing a fraudulent Illinois income tax return for tax years 1984 and 1985, respectively, in that he understated his adjusted gross income for 1984 and 1985 in violation of section 13—1301 of the Illinois Income Tax Act (Ill. Rev. Stat. 1987, ch. 120, par. 13—1301). Counts XVI and XVII of the indictment charged that defendant committed the offense of perjury in that, under oath or affirmation, in a State of Illinois income tax return where by law such oath or affirmation was required, defendant made a false statement, material to the point or issue in question, in that he understated his adjusted gross income for 1984 and 1985 and at the time of commission of said offense defendant did not believe said false statement to be true, in violation of section 32—2(a) of the Criminal Code of 1961. (Ill. Rev. Stat. 1987, ch. 38, par. 32—2(a).) The State's theory of defendant's guilt with regard to counts XIV and XV of the indictment was that defendant failed to declare as income the monies obtained from checks he wrote on decedent's bank account which were procured for defendant's and not decedent's benefit and that defendant was

guilty under counts XVI and XVII of the indictment because he signed his 1984 and 1985 income tax returns whereby he declared his taxable income for those years under penalty of perjury. The jury was instructed that reportable income includes any illegally obtained money.

The evidence indicated that decedent moved from Springfield, Illinois, to Mt. Carmel, Illinois, in October 1983 to be closer to his brother, Lawrence Wright, who was defendant's father. Decedent's health had begun to deteriorate, and he wanted his brother to help take care of him. Decedent executed a limited power of attorney in favor of Lawrence Wright at decedent's bank so that Lawrence could help decedent with his checking account. Lawrence Wright died unexpectedly on May 10, 1984.

Decedent executed a second limited power of attorney at his bank on May 15, 1984, in favor of defendant and Ernestine Wright, defendant's mother, so that they could assist decedent with his banking, and the document recites that it is "for my use and benefit." There was testimony that decedent added the names of defendant and Ernestine Wright to his checking account at the same time, but no signature card was introduced bearing this date. A signature card dated September 26, 1984, was introduced into evidence, however, for account No. 569—554—1 at Security Bank and Trust. Although the authorized signatures on the account card stated, "Merrill H. Wright"/"Ernestine Wright"/"Richard Wright," the evidence indicated that the account was established solely with funds furnished by decedent. Defendant made an admission in his deposition that defendant believed that the money in the account was decedent's and that the limited power of attorney was executed as a matter of convenience for decedent, to assist him when he needed it. This admission was read to the jury.

Decedent resided in an apartment by himself from October 1983 until September 25, 1984, when he was admitted to Shurtleff Nursing Home, with a diagnosis of cancer of the prostate gland and chronic brain syndrome. Dr. Ernest Lowenstein, decedent's physician at the nursing home, described chronic or organic brain syndrome as a progressive disease that involves a decrease in the brain function which results in a reduction in the patient's ability to perform normal activities such as dressing, walking around, treating himself and taking care of his own needs. Decedent had surgery for prostate cancer at Vincennes Hospital in October 1984 and was discharged to the nursing home. The evidence indicates that decedent was often confused during October 1984 and that this may have

been due to the pain medication he received following surgery. Dr. Lowenstein opined that decedent would not have been competent to handle his affairs while he was a patient at the nursing home in October 1984.

Because of decedent's condition he was unable to be discharged from the nursing home to his apartment. Decedent was discharged to a residence located on Mulberry Street in Mt. Carmel in November 1984. The evidence indicates that defendant had purchased the property in January 1984 and delivered a deed to the property to decedent on October 29, 1984. While he resided at the Mulberry Street residence, decedent received 24-hour-per-day nursing supervision. The evidence indicates that during the period of time decedent resided at the Mulberry Street residence defendant visited him nearly every day, did his grocery shopping, cooked meals for the family at decedent's home, put in a vegetable garden for decedent and paid his bills. Defense witnesses also testified that decedent recognized them and was mentally capable.

Decedent was admitted to the Wabash County General Hospital on December 9, 1984, with a broken hip. Decedent's treating physician for this admission, Dr. Narendra Anadkat, again diagnosed decedent with organic brain syndrome and with Parkinson's disease. Dr. Anadkat testified that decedent exhibited impairment and confusion on December 17, 1984, and noted that the nursing records also reported periods of disorientation and confusion. Decedent was discharged from the hospital on December 20, 1984. Dr. Anadkat also testified that decedent was seen at the emergency room on January 11, 1985, with bronchitis and was admitted to the hospital on February 27, 1985, and August 8, 1985. Decedent was described as confused on these dates, and Dr. Anadkat also stated that decedent was hospitalized with acute confusion from August 9 through 15, 1985. Decedent was discharged to the nursing home at that time, but he apparently returned to the Mulberry Street residence. Decedent was readmitted to Wabash County General Hospital on November 22, 1985. He was discharged on December 2, 1985, but was noted to have remained confused. He was readmitted to the hospital on December 30, 1985, with seizures and was described as unresponsive. Decedent died at the hospital on January 30, 1986. The State presented evidence that decedent's estate had dwindled from $800,000 in 1983 to $97,000 at the time of his death.

Defendant presented evidence that decedent executed a general power of attorney in favor of defendant on October 25, 1984, prior to decedent's release from the nursing home. The power of attorney

gave defendant more power to handle decedent's financial affairs. Thelma Bosa, a vice-president of Security Bank and Trust, testified that until decedent entered the nursing home defendant would handle some deposits for decedent but that decedent also handled his own financial transactions. She testified that about that time she had a conversation with defendant about handling decedent's financial affairs and that she told him he would need proper authorization. Attorney Terry Kaid testified that defendant requested preparation of the power of attorney for decedent in October 1984 so that defendant could handle decedent's affairs for him because decedent was unable to do so at that time. However, Kaid testified that he had not spoken to decedent about the instrument and that he did not witness decedent's signature on the document. The decedent's signature thereon was obtained while he was a resident of the nursing home and was notarized. The State presented expert testimony of Steven McKasson, an Illinois State Police forensic scientist, that decedent's signature on the power of attorney was a forgery.

The State presented evidence that one of the checks listed in count I of the indictment was written by defendant to himself in the amount of $38,500 on October 25, 1984. The evidence indicates that this check was used to purchase the Mulberry Street residence for decedent. A deed transferring said property from defendant and his wife to decedent was prepared by attorney Kaid at defendant's request in October 1984.

Decedent also purportedly executed a codicil to his will on November 1, 1984, at the nursing home. The codicil was drafted by attorney Kaid upon the request of defendant, and it named defendant as executor of decedent's estate, devised the Mulberry Street residence to defendant and his sister, Marjorie Leighty, and also purported to convey to them property which had previously been conveyed by decedent into an irrevocable trust. McKasson testified that decedent's signature on the codicil was a forgery.

The first check described in count I of the indictment, in which defendant was charged with theft by deception, was written by defendant on October 22, 1984, to the First National Bank of Allendale for $1,775.62. Rob Coleman of the bank testified that the check was used to make a payment on defendant's personal loan. Other payments to this bank and Security Bank and Trust for interest and/or principal payments on defendant's promissory notes are represented by checks included in counts I, III, IV, VII, VIII, and IX of the indictment. The evidence presented by the State on count

I further indicated that defendant wrote checks to First National Bank on November 20 and 24, 1984, in the respective amounts of $30,000 and $10,000 to set up certificates of deposit in the names of decedent and defendant, his sister Marjorie Leighty, or Ernestine Wright. Moreover, the State presented evidence in count XIII of the indictment that defendant wrote a check to First National in the amount of $20,000 on January 8, 1986, to purchase a certificate of deposit in the names of decedent and defendant, Ernestine Wright, and Marjorie Leighty. However, decedent was to receive the interest earnings on these certificates of deposit because it was his social security number which was listed on the certificate. Defendant also admitted in his deposition that a check written to himself on February 4, 1985, in the amount of $17,000, listed in count II of the indictment, was used to purchase bank stock for himself at the First National Bank, and this admission was presented to the jury.

Defendant and the State entered into certain stipulations which were presented to the jury and indicated that defendant wrote checks for payment of his credit card accounts with Phillips Petroleum Company, Shell Oil Company, J.C. Penney, American Express, and Sears. These checks are included in various counts of the indictment. Defendant also stipulated with the State that he wrote some of the checks listed in counts V, VI, VII, VIII, IX, X, XI, XII, and XIII of the indictment to pay his phone bill, and this stipulation was presented to the jury. In addition, defendant stipulated that he wrote certain checks listed in counts I, II, III, IV, VII, VIII, IX, XI, and XIII of the indictment to General Motors Acceptance Corporation in payment for the purchase of a 1983 Oldsmobile 98 owned by defendant and his wife.

The State presented certain admissions defendant had made in his deposition that checks included in counts IV, V, VI, VII, VIII, IX, X, and XI of the indictment were written by defendant for construction, electrical and plumbing services, paint, plumbing and lumber supplies, appliances, cabinets and siding, a furnace and air conditioning, furniture, and pest control for a home defendant was building at Mesa Lake. Stipulations made by defendant were also presented to the jury that he wrote a check included in count VIII for painting a barn adjacent to the Mesa Lake residence, that he wrote checks included in count V of the indictment to Furrow Building Materials for purchase of building materials for the Mesa Lake residence, and that he wrote a check included in count VIII of

the indictment to purchase carpeting installed in the Mesa Lake residence.

The State presented defendant's stipulation that checks written to All American Life which were listed in counts I, VII, and XIII of the indictment were for payment of life insurance premiums on the life of defendant. Moreover, defendant stipulated that he wrote checks listed in counts VII and XIII of the indictment to Western-Southern Life in payment for life insurance premiums to insure the life of defendant, his wife and family. The State presented evidence that defendant wrote checks to H. J. Mitchell listed in counts I, III, and XIII of the indictment which were used to pay for his automobile insurance. The State also presented defendant's stipulation that he wrote checks listed in counts I, III, VII, X, and XIII of the indictment to Life Investors Insurance Company and Agra Benefits Administration, Inc., for payment of his health and hospitalization insurance. Defendant's stipulation was also presented to the jury concerning checks listed in counts I, VI, VII, and XIII of the indictment to Mount Carroll Mutual Fire Insurance Company to pay the insurance premiums for a farm owners and operators insurance policy on farmland operated by defendant and a homeowners policy on the Mesa Lake home owned by defendant and his wife.

The State also presented evidence that defendant wrote a check for $4,025 on March 25, 1985, to purchase an IRA account for defendant and his wife and another check for $3,000 on April 2, 1985, the proceeds of which were placed in defendant and his wife's interest-bearing account. These two checks were listed in count III of the indictment. With regard to count V of the indictment, the State presented evidence that defendant purchased cemetery lots totalling $4,000 for himself, his wife, his sister and her husband on May 27, 1985.

The State also presented evidence with regard to count IV of the indictment that defendant purchased gasoline, fertilizer, materials and services for his farm by Mesa Lake and that, by deposition admission, defendant agreed that these items were of no benefit to decedent. Defendant also purchased a tractor mower and high-pressure washer on April 4, 1985, the check for which was included in count IV of the indictment. With regard to counts V and VI of the indictment, the State presented evidence that defendant wrote checks to purchase a corn planter and parts.

Defendant further stipulated that he wrote a check for the purchase of a television set for his mother, Ernestine Wright, in February 27, 1985, which check is included in count II of the indictment.

The State also presented the stipulation of defendant that he had written checks included in counts II, IV, and VI of the indictment to the Secretary of State's office to purchase license plate renewals for automobiles and trucks owned by defendant and his wife. Defendant also stipulated that he wrote checks on the account for consumer purchases for himself and his wife from Spiegel and Target and for consumer goods and farm items from Whites, and these checks were listed in counts II, VI, VIII, IX, and XIII of the indictment.

The State moved during trial to amend the indictment in order to strike certain checks from counts I, II, III, IV, V, VI, VII, and VIII, which motion was allowed. The reason given by the State for the motion to amend the indictment was that it did not have sufficient evidence to indicate that those particular checks had not been written by defendant for the benefit of decedent. No evidence was presented by the State with regard to the checks stricken from the original indictment.

The State presented evidence that as executor of decedent's estate, defendant included checking account No. 569—554—1 at Security Bank and Trust as part of the inventory of decedent's estate. The State also presented the certification of the Internal Revenue Service that decedent had never filed a gift tax return prior to his decease. The State also presented a deposition admission of defendant that he was over $300,000 in debt from his farming operations and that his only employment income since 1984 was the $300 per week defendant received from decedent for "investment counseling." The weekly checks for $300 paid to defendant were not part of the indictment.

The State presented evidence that as part of defendant's plan of deception he caused $120,000 in certificates of deposit owned by decedent at Security Bank and Trust to be placed into joint ownership with himself, Ernestine Wright and Marjorie Leighty by obtaining execution of a new signature card on October 29, 1984. Steven McKasson testified, however, that decedent's signature on the card was a forgery. The State also presented evidence that defendant used his general power of attorney to cash in Treasury bills totalling $90,000 held by decedent at the First National Bank of Springfield in December 1984, January 1985, and March 1985 and that from April 1985 through January 1986 defendant cashed in an additional $75,000 in Treasury bills held at the Springfield, Illinois, bank. These securities were each negotiated prior to their maturity. This evidence was presented concerning defendant's plan of decep-

tion, and defendant was not charged with theft of the proceeds of these securities.

The following diagram is included in order to summarize certain pertinent information regarding the 13 theft-by-deception counts, as amended, and the jury's verdicts thereon:

| COUNT | VERDICT | TIME PERIOD | TOTAL |
|---|---|---|---|
| I | Not guilty | 10/22/84—1/26/85 | $86,547.16 |
| II | Guilty | 1/31/85—3/1/85 | $19,890.63 |
| III | Guilty | 3/8/85—4/2/85 | $14,816.07 |
| IV | Not guilty | 4/4/85—4/28/85 | $18,238.73 |
| V | Guilty | 4/30/85—5/27/85 | $14,640.90 |
| VI | Not guilty | 6/3/85—6/18/85 | $ 5,929.31 |
| VII | Guilty | 6/25/85—7/29/85 | $17,626.46 |
| VIII | Guilty | 8/2/85—8/27/85 | $28,501.32 |
| IX | Guilty | 8/30/85—9/25/85 | $12,378.67 |
| X | Guilty | 10/5/85—10/22/85 | $13,887.74 |
| XI | Not guilty | 11/1/85—11/26/85 | $ 8,606.18 |
| XII | Not guilty | 11/30/85—12/23/85 | $ 905.12 |
| XIII | Guilty | 12/20/85—1/22/86 | $27,829.23 |

Following the verdict rendered on May 17, 1991, defendant filed a post-trial motion alleging various grounds of error including, *inter alia*, that the guilty verdicts rendered were inconsistent with the not guilty verdicts, and seeking vacation of the guilty verdicts. The trial court noted that *People v. Rollins* (1985), 140 Ill. App. 3d 235, 485 N.E.2d 1307, contained the best explanation of the background in the area of inconsistent verdicts. The trial court ruled that the verdicts rendered by the jury on May 17, 1991, were inconsistent.

■ Legally inconsistent verdicts, where the same essential element or elements of each crime arising out of the same set of facts are found both to exist and not to exist, are invalid and require reversal of the guilty verdict. (*People v. Frias* (1983), 99 Ill. 2d 193, 198-204, 457 N.E.2d 1233, 1235-36.) In *Frias* the defendant had been charged with murder and armed violence based on murder, and the jury found him guilty only of the armed violence. The supreme court held that since the defendant had been acquitted of murder, under well-established collateral estoppel principles there could be no conviction of armed violence predicated on murder. (*Frias*, 99 Ill. 2d at 202, 457 N.E.2d at 1237.) In contrast, our supreme court has also held that verdicts of guilty of murder and not guilty of armed violence based on murder are not legally inconsistent. (*People v. Barnard* (1984), 104 Ill. 2d 218, 227, 470 N.E.2d

1005, 1007.) The court noted in *Barnard* that while the verdicts may be logically inconsistent, a finding of not guilty of armed violence based on murder was not a finding that defendant did not commit murder. The court concluded that the jury's not guilty verdict could have been an expression of lenity which does not render the verdicts legally inconsistent and require reversal under *Frias*. *Barnard*, 104 Ill. 2d at 227, 470 N.E.2d at 1007.

In *Rollins* the defendants were convicted of aggravated battery but acquitted of armed violence. The appellate court noted that an essential element of a conviction for armed violence is the commission of the underlying felony while armed. The court noted that lenity can be recognized only in cases where inconsistent verdicts rendered in a single trial are found to be merely logically inconsistent as in the *Barnard* case. The court concluded that the finding of not guilty of armed violence based on aggravated battery was not a finding that the defendant did not commit aggravated battery and the not guilty verdict could have been an expression of lenity which does not render the verdicts legally inconsistent or require reversal under *Frias*. *Rollins*, 140 Ill. App. 3d at 242, 485 N.E.2d at 1311.

■ We initially note that the first 13 counts of the indictment, based on theft by deception, are not legally interdependent as the various criminal counts were in the *Frias, Barnard* and *Rollins* cases discussed above, for the criminal conduct in the instant case could be considered as independent acts rather than a single course of conduct. As the State notes, each theft count covers checks which were written during a specifically identified and distinct time period. While proof of murder is a condition precedent for a conviction of armed violence based on murder, proof of each of the elements of theft by deception in one count of the indictment in the instant case is not a condition precedent for proof of theft by deception in any other count of the indictment. Counts XIV and XV and counts XVI and XVII, on the other hand, are dependent upon conviction under the first 13 counts of the indictment, and we note that the jury's verdicts regarding these last four counts are consistent with its verdicts in the first 13 counts because the finding of not guilty in count I, the only count containing checks written in 1984, was consistent with not guilty verdicts in counts XIV and XVI concerning the fraudulent filing of and perjury made with respect to defendant's 1984 tax return.

Where the claim of inconsistent guilty verdicts involves separate offenses for each action taken by defendant, the question to be de-

termined is whether the trier of fact could rationally find separable acts accompanied by mental states to support all of the verdicts as legally consistent. (*People v. Spears* (1986), 112 Ill. 2d 396, 405, 493 N.E.2d 1030, 1034.) Our determination of whether the trial court erred in finding the verdicts on the first 13 counts inconsistent and requiring reversal of each of the guilty verdicts must be determined, therefore, by an examination of whether the jury could rationally have found proof of the elements of theft by deception for checks totalling at least $300 within counts II, III, V, VII, VIII, IX, X, and XIII. While the proof at trial may equally have supported a guilty verdict for theft by deception in Counts I, IV, VI, XI, and XII, this would render the verdicts merely logically inconsistent, with only the rationale of jury lenity to explain them, but not requiring reversal under *Frias*.

However, we also note that defendant's main theory of defense at trial was that when decedent opened the joint checking account at Security Bank and Trust he made a gift of an ownership interest in that account to defendant and accordingly defendant could not be guilty of theft of funds of which he was part owner. Thus, if defendant proved this defense, the elements of proof of theft by deception that decedent was the owner of the money and that defendant obtained control by deception would not be provable by the State and this failure of proof would be applicable to each check within the 13 counts.

The jury was instructed that when a joint bank account is owned it is a gift unless the State proves otherwise. The jury was also instructed that the State must prove beyond a reasonable doubt that decedent did not intend to make a gift of the money in the account to defendant at the time his name was added to the account and that it could consider any evidence that the name of defendant was added to the account for the mere convenience of decedent and any evidence that defendant did not consider himself as having any ownership interest in the money in the account. The State pointed out during argument of defendant's post-trial motion that in finding defendant guilty of any of counts I through XIII the jury had to resolve in the negative the issue of whether by creation of the joint checking account decedent intended to make a gift of that account to defendant. However, we believe it is equally plausible to argue that the verdicts were rendered legally inconsistent if the jury accepted defendant's proof of the gift defense. There must have been another theory utilized by the jury besides joint ownership, therefore, in finding defendant not guilty of counts I, IV, VI,

XI and XII of the indictment in order to maintain the legal consistency within the verdicts rendered on counts I through XIII.

Defendant also presented defense theories that because of familial love, decedent authorized or ratified defendant to write each of these checks and also that the State did not prove beyond a reasonable doubt that at least $300 of the aggregate amount of checks in those counts could not have been spent in actuality for the benefit of decedent. The jury was instructed that when someone owes a fiduciary duty to another, he is not to take selfish advantage or deal with the property in such a manner as to benefit himself, and that the money or property which he handles during discharge of that duty is not his own or for his own benefit but is handled for the benefit of the person granting the power of attorney. The jury was instructed that if it found defendant breached a fiduciary duty to decedent, it may consider that with all the other evidence in the case in determining whether or not there was deception by defendant. The jury was also instructed that it was not necessary for the State to prove all of the checks' amounts set forth in the theft counts and that the State need only prove theft of checks totalling in excess of $300 as to each count.

The State's response to the inconsistent verdict argument was that the jury could have found that decedent was lucid during some periods and could have granted authority to defendant to write checks for his own benefit. Accordingly, not guilty verdicts for those periods of check writing were not legally inconsistent with the guilty verdicts rendered for time periods in which there was evidence that decedent was confused or incapacitated. Defendant pointed out during argument, however, that the jury's determination of guilt does not seem to be related to any logical time frame concerning the decedent's deteriorating mental capabilities or health. We agree that the State's theory regarding consistency of the jury's verdict is belied first of all by the not guilty verdict on count I of the indictment, the time period for which there was considerable evidence that decedent was confused and incapacitated due to the prostate surgery and broken hip. Evidence concerning decedent's mental capabilities during the time period covered in count II of the indictment, February 1985, on which the jury rendered a guilty verdict, in contrast, tended to show that decedent was in a lucid period of mental capability. Thus the jury's guilty verdicts cannot be explained by examining breach of fiduciary duty or lack of authority or ratification during periods of time in which the evidence clearly showed that decedent was incapacitated.

Defendant also argued that the verdicts were inconsistent because payments to certain vendors or credit card companies occurred in time periods in which defendant was found both guilty and not guilty. Moreover, defendant argued that in count I it was not theft for him to purchase the certificates of deposit in the joint names of decedent and his sister, mother and himself, but in count XIII, in which he was found guilty, it was theft to renew jointly owned certificates of deposit. As noted above, the credit card payment stipulations were dispersed among the various theft counts, and as the trial court noted, there were payees and expenditures common to both guilty and not guilty counts. The State responded, however, that in addition to the stipulations regarding payments by defendant on his various credit card bills in the counts noted above, the jury was given the individual credit card bills for which these payments were made and could have found with regard to the not guilty counts that purchases on those accounts during that respective time period could have been made for the benefit of decedent. The State also noted that because the jury was instructed that it had only to find $300 in aggregate checks per count in order to return a guilty verdict, an analysis of a logically inconsistent verdict based on vendor or supplier with a guilty or not guilty verdict need not be done.

On appeal, the State also points out that defendant entered into certain stipulations concerning checks written to White's, Furrow Lumber, Moll Furniture, and Television Equipment Co., and evidence was presented with regard to Smith Sales, Edward D. Jones, and Hall & Korn that the items purchased were for the direct benefit of defendant and his wife and that none of these checks appear in counts where the jury returned a not guilty verdict. Thus, the State argues the jury could have found that except with regard to count XIII (in which none of these vendors' names appear), the guilty verdicts on all other theft-by-deception counts are supported by these checks, which do not also appear in counts in which a not guilty verdict was rendered.

In ruling that the verdicts were inconsistent, the court noted that the victim and legal elements to be proved within the various classes of counts were the same and found that the question to be determined was whether or not the facts are sufficiently different to allow verdicts of not guilty to stand alongside verdicts of guilty. The court noted that, while there were time period differences between counts, the difference was only slight as between pairs of guilty and not guilty counts. The court held that while it was not

ruling on the sufficiency of the evidence, it felt that sufficient legal inconsistency was present among the verdicts to require setting aside of the guilty verdicts.

●3 Although we would acknowledge that it is difficult to state with certainty the basis for the jury's guilty verdicts on counts I through XIII, this alone does not render the verdicts on these counts legally inconsistent. As noted above, although the elements of proof for each of counts I through XIII were the same other than time period and the checks written during that time period, the theory of defense presented by defendant was not limited to the gift-of-the-joint-account theory. It is conceivable, as the State points out above, that with respect to counts II, III, V, VII, VIII, IX, and X the jury could have found that the State only proved theft by deception with regard to the Moll Furniture, Furrow Lumber, White's, Television Equipment Co., Smith Sales, Edward D. Jones and Hall & Korn checks, and that guilty verdicts on these counts are not inconsistent with the not guilty verdicts because these vendors do not appear in the not guilty counts. We also note that count XIII covered the time period immediately prior to decedent's death when the evidence was clear that decedent was mentally incapacitated, and the jury could reasonably have found that none of the checks written during this time period were authorized by decedent or written for decedent's benefit. We find that that jury could reasonably have found defendant guilty of theft by deception in counts II, III, V, VII, VIII, IX, X, and XIII consistent with not proving the elements of the same crime in counts I, IV, VI, XI, and XII because it is plausible that the jury believed that the State only maintained its proof beyond a reasonable doubt on those counts of the indictment. We hold that the trial court erred in finding that the guilty and not guilty verdicts were legally inconsistent such that the guilty verdicts must be vacated.

> " '[W]here the jury returns a verdict of guilty but the trial court thereafter enters a judgment of acquittal notwithstanding the verdict, the double jeopardy clause does not prohibit the State from appealing the judgment of acquittal. If the appeal is successful and the appellate court concludes that a judgment of acquittal was improper, the criminal defendant is not required to submit to a second trial; the error of law may be corrected on remand by simply reinstating the jury's verdict.' " (*People v. Carpenter* (1991), 221 Ill. App. 3d 58, 64-65, 581 N.E.2d 683, 687, quoting *People v. Mink* (1990), 141 Ill. 2d 163, 177-78, 565 N.E.2d 975, 981.)

Accordingly, the July 13, 1991, order of the circuit court of Wabash County is reversed, the jury verdicts of May 17, 1991, of guilty on counts II, III, V, VII, VIII, IX, X, XIII, XV, and XVII are reinstated, and this cause is remanded with directions to enter judgment on those counts and for sentencing.

Reversed; verdicts reinstated; and remanded with directions.

CHAPMAN, P.J., and MAAG,* J., concur.